No. 27,453.

CHARLES. WINSLOW, *Appellee*, v. THE CRETE STATE BANK OF CRETE, NEBRASKA, THE CITIZENS STATE BANK OF DORCHESTER, NEBRASKA, and THE FIRST NATIONAL BANK OF AUGUSTA, *Appellants*.

### SYLLABUS BY THE COURT.

1. TAXATION—*Liability of Persons—Sale Subject to Tax Lien—Admissibility of Evidence.* In an action to recover a sum of money paid by plaintiff to satisfy certain personal-property tax warrants, where the issue was whether defendants as owners had sold to plaintiff a herd of cattle free of tax liens, or had merely sold the cattle as chattel mortgagees and subject to whatever tax liens might exist against the cattle, the exclusion of material and highly probative evidence contained in a deposition of the cashier of one of the defendant banks touching the nature and details of the transaction whereby the sale of the cattle to plaintiff was effected was erroneous and prejudicial.

2. SAME—*Liability of Persons and Property—Necessity of Proof that Tax Lien Followed Propery Sold—Waiver by Admission.* When a mortgagor surrendered a herd of cattle to the mortgagees the want of clear and positive proof that he thereby parted with all his personal property so as to cause a lien to follow the cattle pursuant to R. S. 79-317 was waived by an admission in the mortgagees' pleadings that the cattle were subject to tax liens when they sold them pursuant to their rights as chattel mortgagees.

3. SAME—*Liability Generally.* Other assigned errors considered and not sustained.

Appeal from Ness district court; ROSCOE H. WILSON, judge. Opinion filed June 11, 1927. Reversed.

*A. L. Ferris,* of Ness City, for the appellants.

*Lorin T. Peters* and *Andrew F. Schoeppel,* both of Ness City, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action by Charles Winslow against three banking corporations to recover a sum of money he had been compelled to pay to satisfy certain personal-tax warrants which the sheriff threatened to execute by levy and sale of 164 head of cattle plaintiff had purchased from defendants.

In the spring of 1922 the cattle had belonged to one C. J. Danner, a farmer of Ness county. These cattle, 164 in number, together with 82 other cattle, a number of horses and hogs, farming machinery,

Appeal and Error, 4 C. J. p. 1003 n. 61. Pleading, 31 Cyc. p. 676 n. 45.

Winslow v. Crete State Bank.

household and other chattels, were listed for taxation by Danner in Franklin township, Ness county. Danner had borrowed $10,000 from the Kansas Investment Company, of Ness City, in three notes secured by two mortgages. One of these notes, for $2,000, was assigned to the Citizens State Bank of Dorchester, Neb.; another note for $3,000 was assigned to the Crete State Bank, of Crete, Neb. These two notes were secured by a chattel mortgage on 81 head of Danner's cattle. The third note, for $5,000 was assigned to the First National Bank of Augusta, Kan. It was secured by chattel mortgage on 84 head of Danner's cattle.

Late in 1922 Danner turned over to the Kansas Investment Company as agent for the defendant banks 164 head of cattle, as covered by the above-named mortgages, and left the state without paying his personal-property tax for 1922. The banks kept the cattle until April 11, 1923, when they sold them to plaintiff.

A tax warrant for $78.14 for Danner's personal-property tax for 1922 was placed in the hands of the sheriff for collection. These cattle were also assessed in March, 1923, in Bazine township, Ness county, and a tax warrant for the personal taxes thereon, nominally charged to Danner, for $95.53, was also delivered to the sheriff for collection.

Winslow paid $172 on these tax warrants, and brought this action against the three banks to recover the sum so paid. The banks defended on the ground that they sold the cattle to plaintiff as chattel mortgagees, and that plaintiff well knew at the time of the transaction that they were selling him the cattle by virtue of the terms of their chattel mortgages and not otherwise.

Another defense was that the 164 cattle which defendants sold to plaintiff under their chattel mortgages constituted only part of Danner's personal property, and that they obtained only about half of Danner's herd of cattle. One paragraph of defendants' bill of particulars which told of Danner's indebtedness to defendants alleged:

"The said O. J. Danner failed and refused to pay the said note when the same became due and payable, *and failed to pay the taxes levied and assessed upon said cattle for the year 1922,* and this defendant in pursuance of the terms of the said chattel mortgage and in process of foreclosure thereof sold the interest of the said mortgagor and of this defendant in and to the said cattle, to said plaintiff, *and in the negotiations for such sale this defendant stated to the plaintiff* the sale was a foreclosure sale, *that there were tax liens against the said cattle and that the cattle were being sold* in foreclosure of the said chattel mort-

gage and *subject to all tax liens;* to all of which matters said plaintiff then and there assented." [Italics ours.]

The plaintiff's own testimony tended to prove that he bought the cattle for $6,800 cash, and later that he paid the sheriff the receipted amounts shown on the tax warrants. On cross-examination plaintiff further testified:

"Q. Now then, is it not a fact that at the time you bought the cattle, that Mr. Collett said to you, 'I will take your $6,800 for the cattle. We will turn them over to you, and release the chattel mortgage'? A. Absolutely nothing to it. He did not tell me anything of the kind. . . .

"Q. Did you ask them if they would release the chattel mortgage? A. No, sir, I never said anything about the mortgage, I was buying the cattle. It was not the mortgage I was buying."

O. J. Danner testified for plaintiff:

"Q. While you were residing in Ness county, did you have any business dealings with the Kansas Investment Company? A. Yes.

"Q. You may state what was the nature of those business transactions. A. They held notes and mortgages on my cattle. . . .

"Q. I'll ask you to state whether or not you had a conversation with the Kansas Investment Company concerning these cattle, under these mortgages, in the fall of 1922? A. Yes. . . .

"Q. You may state what was said, if anything, in this conversation concerning the cattle you had mortgaged to these three banks, through the Kansas Investment Company? A. I told Mr. Lennen and Mr. Borthwick [officers of the Kansas Investment Company] that I was going to turn the cattle to them and they could do whatever they thought best with the cattle; that I was going to take bankruptcy. I was forced to.

"Q. You may state what, if anything, was said to this? A. Mr. Lennen said he would take it up with the banks."

At the conclusion of plaintiff's evidence defendants lodged general and special demurrers against it. These were overruled. Defendants then produced witnesses who testified that when Winslow purchased the cattle he was explicitly told that defendants did not know about the status of Danner's personal taxes. Collett, manager of the Crete State Bank, testified:

"Mr. Winslow asked if the chattel mortgage would be released. We said that we would turn over the chattel mortgages. Mr. Winslow asked further if the taxes were paid on these cattle and we told him we did not know anything about that, that all we would do for his $6,800 was to turn over the chattel mortgages."

Nelson, president of the Citizens State Bank of Dorchester, testified:

"Before the deal was finally closed, Mr. Winslow said something about taxes. 'What if the taxes are not paid on these cattle?' I think that was the only time I said anything. I answered him, saying, 'I suppose that Mr. Danner will have to pay the taxes as they are the Danner cattle.' . . .

"Mr. Winslow said that, 'You will see that those chattel mortgages on those cattle are released?' And—I think it was Mr. Borthwick—said, 'Yes, we will see to that,' and Mr. Borthwick released those chattel mortgages that same day."

Lennen, an officer of the Kansas Investment Company, testified:

"Q. Do you recall any further conversation in the office of the Kansas Investment Company during the consummation of the deal that day? A. The matter of taxes came up.

"Q. Well, who said anything about taxes? A. I think Mr. Winslow; to my recollection.

"Q. What did he say? A. To my recollection, he inquired about the taxes.

"Q. Did you hear any answer to the inquiry? A. Mr. Winslow answered— I think Mr. Collett answered Mr. Winslow, that he knew nothing about the taxes; he was just selling the cattle for so much money."

The personal-property statement of O. J. Danner for 1922 was introduced in evidence. It showed that on April 10, 1922 (as of March 1), Danner owned 52 cattle other than the 165 head held under mortgages by defendant banks. It showed also that Danner owned 15 head of horses and mules and stallions, 8 hogs, 11 farm implements, 1 wagon, 1 automobile, and miscellaneous other goods and chattels, of an aggregate assessed valuation of $6,380.

A tax statement signed by one Sheldon, presumably the person in charge of the mortgaged cattle, showed a listing of 144 cattle in Bazine township (as of March 1) dated April 19, 1923, was also introduced.

The deposition of another witness, W. A. Penley, cashier of the First National Bank of Augusta, was also adduced in evidence. Part of Penley's deposition was excluded, which raised a question to be dealt with later in this opinion.

The jury returned a verdict for plaintiff for $172. Defendants appeal, assigning several errors which will be noted.

The first error assigned relates to the exclusion of the following testimony from the deposition of W. A. Penley, cashier of the First National Bank of Augusta.

"Q. State what business transactions you had with him (Winslow) with reference to the sale of the cattle described in the Danner mortgage? A. The mortgagor failed to pay the debt when due and was in default. I went to

Ness county and took possession of the cattle under the mortgage and proceeded to foreclose the mortgage and sell the cattle. I negotiated with plaintiff and sold the cattle to him. I informed him at the time that I was representing the First National Bank, who was the holder of the mortgage against the property, and that I was selling him the property under foreclosure proceedings for the bank.

"Q. What if anything was said at that time in regard to delinquent taxes against the property? A. I informed plaintiff that there were taxes against the property which he would have to settle. Plaintiff then stated that he would assume and settle the taxes, and the deal was closed on that basis and the price agreed upon was paid by plaintiff and the transaction closed. The First National Bank had no title or interest in the property, except the lien under the mortgage. I informed plaintiff of this fact at the time. Plaintiff knew that these cattle were owned by O. J. Danner and that we were foreclosing our mortgage against them."

The objection lodged against this testimony was that it was "incompetent, irrelevant, and immaterial, and for the further reason that the same is not responsive to the question and calling for a conclusion of the witness."

For some one or all of these reasons, not one of which had the slightest merit, this highly probative and important testimony covering the one matter of prime and controlling importance in this lawsuit was excluded. The First National Bank of Augusta was called upon to pay or contribute to the payment of $172 in plaintiff's behalf, which testimony, if believed (and the trial court did not have the right to disbelieve it when deciding the question of its competency), would have established beyond cavil that the bank was not selling Winslow its own property but simply foreclosing its chattel mortgage. There are, indeed, a few words at the beginning of the answer to question 5 which are not strictly responsive, but they were introductive to the nature of business transactions the witness was asked to narrate, and the objection to that prefatory matter was captious and without merit. The exclusion of the answers of this witness to questions 5 and 6 was erroneous and prejudicial.

The next error urged relates to the court's ruling on defendants' demurrer to plaintiff's evidence. The basis of the contention is that plaintiff did not show that Danner's surrender of these 164 head of mortgaged cattle to defendants necessarily implied that he then and thereby parted with all the personal property he possessed, so as to bring into operation that provision of the tax law which read:

Winslow v. Crete State Bank.

"If any person in this state, after his personal property is assessed and before the tax thereon is paid, shall sell all of the same to any one person, and not retain sufficient to pay the taxes thereon, the tax for that year shall be a lien upon the property so sold, and shall at once become due and payable, and the county treasurer shall at once issue a tax warrant for the collection thereof, and the sheriff shall forthwith collect it as in other cases. The one owing such tax shall be civilly liable to any purchaser of such property for any taxes he owes thereon, but the property so purchased shall be liable in the hands of the purchaser or purchasers for such tax: *Provided, however,* If the property be sold in the ordinary course of retail trade it shall not be so liable in the hands of the purchasers." (R. S. 79-317.)

Defendants refer to the lengthy list of other chattel property which Danner owned in the spring of 1922, and to the silence of the record as to when and how he parted with all his other personal property, or that he turned over all his other chattels to an assignee in bankruptcy prior to the surrender of the mortgaged cattle to defendants; and therefore, say defendants, the conditions under which the statute would operate were not shown to exist. However, in view of the admissions in defendants' bill of particulars to the effect that the cattle were subject to tax liens, and also the allegations in their bill of particulars that defendants had so informed the plaintiff and that they were selling him the cattle subject to all tax liens, the want of proof that these 164 cattle constituted all the personal property Danner had when he surrendered them to defendants became immaterial. Unless these 164 cattle were all the personal property Danner then had, there was, of course, no tax lien on them; but if there was a tax lien, as alleged by plaintiff and admitted by defendants, it is fairly inferable that Danner had already parted with all his other chattels without paying the taxes thereon, and the lien would therefore attach to these mortgaged cattle.

Another objection to the judgment relates to the tax lien of 1923. Defendants say it was not due. Ere 1923 Danner had left the county. Defendants were in charge of these cattle so as to require them to cause the cattle to be listed for taxation (R. S. 79-301), and since these defendants were banking corporations of distant cities there can be no presumption that they had any other chattel property in Ness county when they sold these cattle to Winslow in April, 1923. Having parted with all these cattle in Ness county after they were assessed and before the tax thereon was paid, a tax lien followed the cattle, and whether the tax was then due or not it would

have to be paid eventually, and Winslow having paid it, not as a mere intruding volunteer, but under colorable constraint at least, was entitled to reimbursement.

It is also urged that plaintiff failed to prove that the provisions of R. S. 79-2101 to 79-2105, inclusive, relating to the mode of collecting personal taxes were followed. But Winslow was justified in paying the tax warrants without waiting for all the county officials to perform their particular statutory bits of functioning. If he had waited for all these details, it would merely have enlarged the tax liens by the addition of statutory charges and penalties which these defendants will have to pay if they are eventually held liable.

There is nothing else in this record to justify further discussion. Because of the exclusion of highly probative and material testimony which should have been submitted and considered by the jury, and the want of which very probably did affect the general verdict, the judgment must be reversed for a new trial.

The judgment is reversed.

HUTCHISON, J., not sitting.